587 A.2d 1367

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Frank CHESTER, Appellant.**

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Richard LAIRD, Appellant.**

Supreme Court of Pennsylvania.

Argued April 3, 1990.

Reargued Oct. 25, 1990.

Decided March 20, 1991.

Reargument Denied June 18, 1991.

580

584

William F. Mabon, Gregg M. Blender and John J. Fioravanti, for appellants.

Alan M. Rubenstein, Dist. Atty., Stephen B. Harris, and Robert A. Graci, Chief, Deputy Atty. Gen., for the Com.

Argued before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA, PAPADAKOS and CAPPY, JJ.

Reargued before NIX, C.J., and LARSEN, FLAHERTY, ZAPPALA, PAPADAKOS and CAPPY, JJ.

586

## OPINION

NIX, Chief Judge.

Appellants herein, Frank Chester and Richard Laird, were tried and found guilty of Murder in the First Degree [1] with the jury imposing the penalty of death for both defendants in connection with the death of Anthony Milano. After consideration of post-verdict motions, the court below sustained the convictions and the matter is now before this Court on direct appeal pursuant to 42 Pa.C.S. § 9711(h).[2]

As in all death penalty cases, we must determine whether the evidence, when viewed in a light most favorable to the Commonwealth together with all reasonable inferences therefrom, was sufficient to establish guilt beyond a reasonable doubt of each element of the offenses charged. *Commonwealth v. Lewis*, 523 Pa. 466, 471, 567 A.2d 1376, 1378 (1989). *See also, Commonwealth v. Jackson*, 506 Pa. 469, 473, 485 A.2d 1102, 1103 (1984); *Commonwealth v. Macolino*, 503 Pa. 201, 469 A.2d 132 (1983); *Commonwealth v. Ransome*, 485 Pa. 490, 493, 402 A.2d 1379, 1381 (1979). Applying this standard we find that the following facts were established.

During the evening of December 14, 1987, Anthony Milano, the deceased, went to his father's home to advise his father that he intended to go out for the evening. The victim left the father's residence at approximately 11:15 p.m. in a 1976 Chevrolet Nova, registered in the name of Rose Milano, the mother of Anthony. The deceased proceeded to the Edgely Inn, where the appellants also happened to be on that occasion. Appellants had been in the tavern for quite some time prior to the arrival of Milano. Both appellants had exhibited quarrelsome and aggressive

---

**1.** Appellants were also convicted of Kidnapping, 18 Pa.C.S. § 2901, Aggravated Assault, 18 Pa.C.S. § 2702, Unlawful Restraint, 18 Pa.C.S. § 2902, False Imprisonment, 18 Pa.C.S. § 2903, Conspiracy, 18 Pa.C.S. § 903, and Possession of an Instrument of Crime, 18 Pa.C.S. § 907.

**2.** Argument was heard in the appeal of Frank Chester during our January, 1990, argument session. The argument in the appeal of Richard Laird was not heard until our October, 1990, argument session.

behavior before the deceased arrived at the Inn. Chester, who possessed skills in the art of Karate, had threatened to assault one of the male guests at the establishment and Laird was loud and argumentative that evening in the premises.

The victim arrived at the Inn sometime after 11:15 p.m. and left shortly after closing time, accompanied by appellants. The three men were last observed in the Nova with Milano driving and Laird supplying directions as to their destination. There was also testimony that during the time that the three men were in the tavern the appellants at one point were taunting Milano as to his masculinity.

On the evening of December 15, Officer McGuigan responded to a report of a car fire. The vehicle involved was a Chevrolet Nova. A search of the wooded area adjacent to where the automobile was parked resulted in the discovery of the body of the deceased, Anthony Milano. The body was lying face up with the left eye partially open, contusions in the facial area, and multiple "slashings" on the neck and throat. A postmortem examination revealed that the victim had been assaulted about the face and had sustained lacerations about the face, throat, neck, and shoulder. The pathologist concluded that the deceased had been kicked and/or punched in both the right and left temple areas and the chin. A hairline fracture at the base of the skull was attributed to a blunt instrument striking the head. The lacerations were made by a sharp instrument, consistent with a utility knife. The pathologist opined that the "slashings" were hard enough and deep enough to sever the fifth and sixth vertebrae and were too numerous to count. It was also concluded that the victim aspirated on his own blood for five to ten minutes before expiring.

Officer McGuigan testified that when he arrived at the scene he first observed the vehicle ablaze and assisted in extinguishing the fire. The vehicle was identified as being the 1976 Chevrolet Nova registered in the name of Rose Milano, the mother of the deceased. Police records further

established that Mrs. Milano had reported the deceased as a "missing person" when he failed to return to the family home in the early morning hours of December 15, 1987. This officer further testified that prior to the response to the car fire, at approximately 1:30 a.m. on December 15, he had responded, with two fellow officers, to a reported stolen car which was found in a parking lot of the Edgely Inn. To pursue their investigation they began interrogating the customers in the Edgely Inn. During that investigation he observed Chester, Laird, and the decedent at the bar. The time was fixed at approximately 1:30 a.m., December 15. He requested identification from each of these individuals and was satisfied that they were not involved in the car theft. At approximately 2:10 a.m., while he was still in the parking lot, he observed the deceased, Chester, and Laird leave the Inn together. This testimony was confirmed by the two officers that responded with Officer McGuigan to the stolen car complaint.

The fire marshal for the township testified that in his opinion the fire which involved the Milano vehicle was deliberately and intentionally ignited. In addition, the Commonwealth presented evidence to establish that at approximately 4:00 a.m., December 15, Chester and Laird approached, on foot, the apartment of a friend of Chester's, Richard Griscavage. Griscavage's apartment was located less than a mile from the murder scene. Griscavage testified that both were visibly agitated and were covered with blood. Chester attempted to explain their condition by stating that had been engaged in a fight and "the dude is dead." Griscavage took both men to Laird's apartment where they attempted to remove and conceal their bloody clothing. The Commonwealth also produced additional witnesses to whom appellants made incriminatory statements and actions that reflected their complicity in the murder.

The Commonwealth also produced a transcription of a consensually intercepted telephone call between Chester and Laird, during which Laird suggested that Chester leave town, recommended ways Chester could pass a polygraph

examination, and commented on the Commonwealth's inability to prove a case without evidence. Both defendants testified at trial and admitted being at the scene.

A criminal homicide constitutes murder in the first degree when it is committed by an intentional killing. 18 Pa.C.S. § 2502(a). Clearly, the evidence presented at trial was sufficient to sustain a conviction of first degree murder. The use of a deadly weapon on a vital part of the body warrants an inference that the act was done with a specific intent to take life, *Commonwealth v. Holley*, 358 Pa. 296, 56 A.2d 546 (1948); thus, the slashing of the victim's throat supports the jury's finding herein that the killing was intentional. Moreover, the fact that the victim was last seen leaving a bar with appellants, as well as their conduct after the murder, their statements to friends and to the police, their bloodstained attire, and their testimony at trial, are all sufficient evidence of their guilt of the first degree murder of Anthony Milano. *See Commonwealth v. Finnie*, 415 Pa. 166, 202 A.2d 85 (1964). Appellants' claims to the contrary must therefore be rejected as meritless.

We now address appellants' various claims of pretrial and trial error. Appellants' first contention is that the trial court erred in denying a motion to sever appellants' trials. Appellants argue that separate trials should have been provided because their defenses were antagonistic, and their inability to adequately present these defenses because of the joint trial was prejudicial.

The decision whether to grant a motion for severance is a matter within the sound discretion of the trial court and should not be disturbed absent a manifest abuse of discretion. *Commonwealth v. Tolassi*, 489 Pa. 41, 413 A.2d 1003 (1980); *Commonwealth v. Lasch*, 464 Pa. 573, 347 A.2d 690 (1975); *Commonwealth v. Patrick*, 416 Pa. 437, 206 A.2d 295 (1965). Here the defendants were charged with conspiracy as well as first degree murder. Joint trials are advisable where conspiracy is charged. *Commonwealth v. Patterson*, 519 Pa. 190, 546 A.2d 596

(1988); Pa.R.Crim.P. 1127(A)(2). Where, however, a party can show that he will be prejudiced by a joint trial, severance is proper. *Commonwealth v. Patterson, supra;* Pa. R.Crim.P. 1128.

In the instant matter appellants correctly assert that the probability of antagonistic defenses is a factor which the trial court should consider in deciding whether to grant severance. *Commonwealth v. Morales,* 508 Pa. 51, 494 A.2d 367 (1985). However, more than a bare assertion of antagonism is required. *Id.* The mere fact that there is hostility between defendants, or that one may try to save himself at the expense of another, is in itself not sufficient grounds to require separate trials. *See Commonwealth v. Bennie,* 352 Pa.Super. 558, 508 A.2d 1211 (1986). *See also United States v. Provenzano,* 688 F.2d 194 (3d Cir.), *cert. denied,* 459 U.S. 1071, 103 S.Ct. 492, 74 L.Ed.2d 634 (1982). In fact, it has been asserted that the fact that defendants have conflicting versions of what took place, or the extents to which they participated in it, is a reason for rather than against a joint trial because the truth may be more easily determined if all are tried together. *Ware v. Commonwealth,* 537 S.W.2d 174 (Ky.1976). *See, generally,* 2 La Fave and Israel, Criminal Procedure § 17.2 (Third Edition).

Instant appellants' claim of antagonism falls within this latter category. Neither Chester nor Laird denied involvement in the killing of Anthony Milano. Rather each man claimed that the other had slashed Milano's throat. (N.T. 5/18/88 at p. 480.) [3] These assertions, while inconsistent, do not rise to the level of antagonism that requires severance. Defenses become antagonistic only when the jury, in order to believe the essence of testimony offered on behalf of one defendant, must necessarily disbelieve the testimony of his co-defendant. *United States v. Berkowitz,* 662 F.2d 1127 (5th Cir.1981). In this case the jury was not faced with such a dilemma. Both men conceded their

---

**3.** Although Laird does not specifically testify to this fact, his position can be inferred from the averments in his brief. *See* Brief of Appellant Laird at p. 28.

participation in the killing and disputed only their respective acts in furtherance thereof. Appellants' claim of error with respect to the denial of severance must therefore fail.

Appellants' next argument relates to the admission into evidence of five photographs of the victim. Appellants argue that these photographs, which were taken at the scene, were inflammatory, that their prejudicial effect outweighed their probative value, and that they were merely cumulative evidence.

The photographs in question depict the body of the deceased at the time he was found. They depict with great clarity the victim's slashed throat, the victim's open eye, and various other head injuries. The Commonwealth contends that the pictures were properly admitted as evidence of the specific intent to kill and of the aggravating circumstance of torture.

Photographs of a murder victim are not *per se* inadmissible. *Commonwealth v. Szuchon,* 506 Pa. 228, 484 A.2d 1365 (1984); *Commonwealth v. Woodward,* 483 Pa. 1, 394 A.2d 508 (1978); *Commonwealth v. Liddick,* 471 Pa. 523, 370 A.2d 729 (1977); *Commonwealth v. Petrakovich,* 459 Pa. 511, 329 A.2d 844 (1977); *Commonwealth v. Collins,* 440 Pa. 368, 269 A.2d 882 (1970). It is the manner in which the corpse is displayed that causes photographs to be emotionally charged. *Id.* The admission of such photographs is a matter within the sound discretion of the trial judge. *Commonwealth v. Petrakovich, supra; Commonwealth v. Scaramuzzino,* 455 Pa. 378, 317 A.2d 225 (1974). The test for determining the admissibility of such evidence requires that the court employ a two-step analysis. *Commonwealth v. Liddick, supra; Commonwealth v. Petrakovich, supra.* First a court must determine whether the photograph is inflammatory. If not, it may be admitted if it has relevance and can assist the jury's understanding of the facts. *Commonwealth v. Petrakovich, supra.* If the photograph is inflammatory, the trial court must decide whether or not the photographs are of such essential evidentiary

value that their need clearly outweighs the likelihood of inflaming the minds and passions of the jurors. *Id. See also, Commonwealth v. Liddick, supra; Commonwealth v. Scaramuzzino, supra.* If an inflammatory photograph is merely cumulative of other evidence, it will not be deemed admissible. *Commonwealth v. Liddick, supra; Commonwealth v. Scaramuzzino, supra.*

■ In analyzing this issue we must begin with the obvious premise that looking at the cosmetically unretouched photographs of a corpse is, by its very nature, an unpleasant task. However, the inherent unpleasantness of the photographs does not render them inflammatory. It should be noted that in this case there were dozens of pictures offered into evidence, but the trial judge eliminated the majority of the pictures, ruling only five to be admissible (exhibits 3 through 7). Of the five, exhibits 3, 4, 6 and 7, while somewhat gruesome due to their subject matter, are not inflammatory. The pictures do not display the corpse in a manner which would tend to inflame or outrage the jury. No excess blood was visible in the pictures and, as we noted in *Commonwealth v. Chacko*, 480 Pa. 504, 507, 391 A.2d 999, 1000 (1978), "the trial judge took the wise precaution of covering those portions of the photographs" showing a particularly gruesome neck wound, *quoting Commonwealth v. Brueckner*, 458 Pa. 39, 44, 326 A.2d 403, 406 (1974). Thus, these four photographs were admissible as relevant and helpful to an understanding of the Commonwealth's case.

■ Exhibit 5, however, presents a more difficult problem. It is a color photograph depicting a closer view of the victim's body, in which the gaping neck wound is clearly visible. No attempt was made to cover up the gruesome details of the photograph, and the fact that it is a color photograph highlights the gory detail. *See, Commonwealth v. Chacko, supra.* We therefore find it to be inflammatory, and address the Commonwealth's contention

that it was essential evidence of the defendants' specific intent to take the life of Anthony Milano.[4]

The Commonwealth contends that the severity of the slashing demonstrates that defendants' intention was not merely to injure the victim but to end his life. The photograph vividly emphasizes the coroner's testimony that Milano's throat was slashed more times than could be counted, and negates the image the defendants intended to convey by their statements, that they simply had engaged in an altercation with Milano which unintentionally resulted in his death. Accordingly, we find that the trial judge did not abuse his discretion. *See Commonwealth v. Scaramuzzino, supra.*

Appellant Laird next argues that statements made by co-defendant Chester to certain third parties were hearsay and, as such, were inadmissible. Laird contends that the trial court improperly admitted under the co-conspirator's exception various statements made by Chester after the murder in which Chester told friends that "the dude is dead" (N.T. 5/15/88, p. 218, 222), that Laird had cut Milano's throat (*Id.,* at p. 219), and in which conversations Chester discussed with friends how to dispose of Milano's car and whether Chester should report the incident to the police. (Id., at p. 214.) Laird argues that because these statements were made *after* the murder had been committed they could not have been made in furtherance of a conspiracy whose objective was to accomplish that murder. Laird argues that attempts to cover up a crime do not constitute the continuation of the conspiracy.

The Commonwealth correctly notes that the duration of a conspiracy depends upon its facts, which help determine the scope of the original agreement. *Commonwealth v. Pass,* 468 Pa. 36, 360 A.2d 167 (1976). A conspir-

---

4. The Commonwealth also argues that the picture was essential evidence of the aggravating circumstance of torture. Such an argument would be helpful at the penalty phase of the proceedings, but does not overcome an objection to the introduction of the photographs at the guilt phase.

acy, for purposes of the co-conspirator exception to the hearsay rule, may be inferentially established by showing the relation, conduct, or circumstances of the parties. *Commonwealth v. Dreibelbis*, 493 Pa. 466, 426 A.2d 1111 (1981); *Commonwealth v. Roux*, 465 Pa. 482, 350 A.2d 867 (1976). The evidence at trial established that appellants conspired to murder Anthony Milano. However, an examination of the facts of this case reveals that an integral part of the conspiracy was the concealment of the evidence after the commission of the murder. *See, Commonwealth v. Wilson*, 394 Pa. 588, 607, 148 A.2d 234, 239 (1959). Thus, the conspiracy did not terminate upon the killing of Milano, *see Commonwealth v. Dreibelbis, supra*, 493 Pa. at 475, 426 A.2d at 1115, and Chester's statements were properly admitted under the co-conspirator's exception to the hearsay rule.

█ Appellant Laird next contends that the trial judge improperly instructed the jury as to the admissibility of hearsay statements. Laird argues that the trial court erred in instructing the jury that it had to determine whether a conspiracy existed in order for the statements made by Chester to his friends to be admissible. Laird argues that the trial court's instructions to the jury improperly forced the jury to decide one of the principal charges before hearing all of the evidence.

The trial judge's instructions to the jury were as follows:
THE COURT: Members of the jury, at this point I want to give you some of the testimony you're about to receive.

You'll recall when each of you underwent the individual *voir dire* that we had, you were carefully asked whether you would be able to discriminate between the effect of certain testimony of individual defendants because both are being tried in the same case and whether you could fairly segregate that information and apply it only to the person to whom it should be applied, and I want to be very clear now about the implication of the testimony you're about to receive in light of that requirement of segregating information and applying it to one or both of the defendants, and I trust that you will continue to be

able to make that discrimination [sic]. After the closing speeches of the attorneys I will be instructing you very comprehensively of all the law that you will need to know to decide this case and among the matters I will be discussing will be the legal requirements of conspiracy and I'll explain to you all the background of that and what's required with respect to it.

The burden of proof of a conspiracy is always upon the Commonwealth beyond a reasonable doubt. Now, if you find beyond a reasonable doubt after those instructions that there was a conspiracy between the two defendants with respect to the alleged crime in this case, and if you find that the conspiracy continued, that it was a continuing conspiracy throughout all of the events that this witness may be testifying to, and that other witnesses may be testifying to, then for so long as you find beyond a reasonable doubt that conspiracy continued, then the statement or expression of one of these defendants is not only receivable by you with respect to that defendant in that case but is also receivable by you against the other defendant in the other case.

If, however, the Commonwealth does not satisfy you beyond a reasonable doubt that these statements were uttered in the course of a continuing conspiracy and if you conclude that the Commonwealth has not satisfied you beyond a reasonable doubt that conspiracy was a continuing conspiracy, then the statements of either one of these defendants is only admissible in the case against himself.

\* \* \* \* \* \*

(N.T. 5/17/88, pp. 206–208.)

At this point the trial judge explained that he had interrupted the trial to clarify the conspiracy requirements and the possible need for segregating certain testimony. He then elaborated on the instructions.

▇▇▇ Laird submits that these instructions forced the jury to assume the trial judge's responsibility of determin-

ing whether the evidence presented was sufficient to trigger the hearsay exception. This allegation must also be rejected as meritless. Appellant Laird is correct in asserting that the judge, not the jury, is to resolve preliminary factual questions which form a basis for the legal admissibility of evidence. *Commonwealth v. Cooley*, 465 Pa. 35, 348 A.2d 103 (1975); *Commonwealth v. Speller*, 445 Pa. 32, 282 A.2d 26 (1971). However, it is clear that there was sufficient evidence in the record prior to the admission of the testimony in question upon which the trial judge could have determined that proof of the conspiracy was strong enough to trigger the hearsay exception. The judge's instructions to the jury at that point merely helped the jury to put the testimony into the proper context.

Laird's next contention is that the trial court erred in admitting the redacted statement made by co-defendant Chester to the police. He admits that redacted statements of a co-defendant are admissible, but he argues that in this case the effect of the statement was merely to bolster the case for co-defendant Chester at Laird's expense. This argument is clearly meritless. First, as appellant readily concedes, the confession of a co-defendant is admissible if it can be edited so that it retains its narrative integrity and yet in no way refers to the other defendant. *Commonwealth v. Johnson*, 474 Pa. 410, 412, 378 A.2d 859, 860 (1977). Redaction is the generally accepted method of editing such a statement. *Id.* In the instant matter Laird's defense counsel made a pretrial motion to suppress Chester's statements to the police, and the motion was denied. The trial court also overruled counsel's trial objection on this point. The record reflects that the trial judge exhibited great concern for the potential prejudice which could result from the admission of Chester's confessions, which also implicated Laird, and was quite explicit in instructing the Commonwealth that all possible references to Laird were to be removed. The statement offered by the Commonwealth, through the detective to whom it was made, omitted any reference to Laird and inculpated only Chester. All possi-

ble precautions were taken to avoid unnecessary prejudice to either defendant. *See id.*[5]

■ Next, Laird argues that the trial court erred in refusing to allow testimony relating to co-defendant Chester's refusal, upon submitting to a polygraph examination, to answer the question, "Did you kill Anthony Milano?" Laird submits that Chester's refusal to respond to this question was relevant to and probative of the identification of Milano's killer and should have been admitted for the that purpose.[6] This argument must also fail. This Court has repeatedly and consistently held that results of a polygraph examination are inadmissible for any purpose. *Commonwealth v. Gee*, 467 Pa. 123, 354 A.2d 875 (1976); *Commonwealth v. Brooks*, 454 Pa. 75, 309 A.2d 732 (1973). *See, e.g., Office of Disciplinary Counsel v. Wittmack*, 513 Pa. 609, 522 A.2d 522 (1987).

■ Appellant Laird next complains that his Fifth and Sixth Amendment rights were violated by the admission of a statement made by him to a constable during a recess of his preliminary hearing. During the recess the constable in charge of transporting Laird to and from the courtroom asked Laird if it was true that Laird's attorney wanted Laird to wear a bullet-proof vest. Laird replied that it was true, because the "gay lib people had put a contract out on his life." Laird argues that because he made the statement while in custody, he was deprived of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Under *Miranda v. Arizona*, "the prosecution may not use statements, whether exculpatory or inculpatory, *stemming from custodial interrogation* of defendant unless it demonstrates the use of procedural safeguards effective to

5. Laird's argument that the statement served only to bolster Chester's case at his expense is also meritless. Clearly the jury believed that both men were equally culpable, as both were convicted of every charge and sentenced to death.

6. Laird also argues that this evidence would have been admissible at a separate trial. This contention is also meritless. *See Commonwealth v. Gee*, 467 Pa. 123, 354 A.2d 875 (1976).

secure the privilege against self-incrimination." Id. at 444, 86 S.Ct. at 1612. *Commonwealth v. Simala,* 434 Pa. 219, 222, 252 A.2d 575, 576 (1969). (Emphasis added.) While it is undisputed that Laird was in custody at the time he made the statement, he nevertheless has not satisfied the custodial *interrogation* requirement for the exclusion of the statement in question. "Interrogation" has been defined as "any question likely to or expected to elicit a confession." *Id.,* 434 Pa. at 227, 252 A.2d at 581. The requirement of "interrogation" is designed to permit the use by the prosecution of a confession that is given by the accused *without any prompting. Id.,* 434 Pa. at 226, 252 A.2d at 581 (emphasis supplied). Under the circumstances it is clear that appellant's statement was made without any prompting, as the constable's question merely required a yes or no answer. More importantly, the query was not calculated by the constable to evoke an admission, *see Commonwealth v. Brantner,* 486 Pa. 518, 527, 406 A.2d 1011, 1015 (1979), but was simply an inquiry for the purpose of ascertaining the level of security necessary to protect appellant during the proceedings. Thus, appellant Laird's claim of error on this issue must also fail.

Appellants' next claim of trial error relates to remarks made by the prosecutor during his closing argument to the jury. Appellants contend that the following statement constitutes prosecutorial misconduct which requires a new trial.

DISTRICT ATTORNEY: We're here because together with the coldness of heart, hard to believe, and with an evil intention of mind, that we just sometimes can't comprehend, and with ice water running through their veins and a coldness of disposition, they treated him like a cheap piece of tenderloin, and they carved him up.

Appellants contend that in making this statement the prosecutor abused the broad latitude given him in making argument to the jury and intentionally made a statement calculated to inflame the passions of the jury and to impair the jury's inability to render a true verdict based on the weight

of the evidence. According to appellants, the result of these statements was that the jury was unavoidably prejudiced. *Commonwealth v. Stoltzfus*, 462 Pa. 43, 337 A.2d 873 (1975).

As appellants concede, the prosecutor is permitted wide latitude in making argument to the jury. *Commonwealth v. Brown*, 489 Pa. 285, 297, 414 A.2d 70, 76 (1980); *Commonwealth v. Cronin*, 464 Pa. 138, 346 A.2d 59 (1975). Guidelines governing the review of allegedly improper remarks made by a prosecutor during argument were set forth in *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 53–54, 454 A.2d 937, 956–57 (1982).

> The primary guideline in assessing a claim of error of this nature is to determine whether the unavoidable effect of the contested comments was to prejudice the jury, forming in their minds fixed bias and hostility towards the accused so as to hinder an objective weighing of the evidence and impede the rendering of a true verdict. *Commonwealth v. McNeal*, 456 Pa. 394, 319 A.2d 669 (1974); *Commonwealth v. Van Cliff*, 483 Pa. 576, 397 A.2d 1173 (1979). In making such a judgment, we must not lose sight of the fact that the trial is an adversary proceeding, Code of Professional Responsibility, Canon 7, E.C. 7–19—7–39, and the prosecution, like the defense, must be accorded reasonable latitude in fairly presenting its version of the case to the jury. *Commonwealth v. Cronin*, 464 Pa. 138, 346 A.2d 59 (1975). Nevertheless, we do require that the contentions advanced must be confined to the evidence and the legitimate inferences to be drawn therefrom. *Commonwealth v. Revty*, 448 Pa. 512, 295 A.2d 300 (1972). Deliberate attempts to destroy the objectivity and impartiality of the finder of fact so as to cause the verdict to be a product of the emotion rather than reflective judgment will not be tolerated. *Commonwealth v. Story*, 476 Pa. 391, 383 A.2d 155 (1978). The verdict must flow from the respective strengths and weaknesses of the evidence presented and not represent a response to inflammatory pleas for either leniency or

vengeance. *Commonwealth v. Starks*, 479 Pa. 51, 387 A.2d 829 (1978).

*See also Commonwealth v. Pursell*, 508 Pa. 212, 226–227, 495 A.2d 183, 190–191 (1985).

These remarks made by the prosecutor were not a deliberate attempt to destroy the objectivity of the fact finder, but merely summarized the evidence presented at trial with the oratorical flair permitted during argument. *See Commonwealth v. Barren*, 501 Pa. 493, 462 A.2d 233 (1983); *Commonwealth v. Shain*, 493 Pa. 360, 426 A.2d 589 (1981); *Commonwealth v. Anderson*, 490 Pa. 225, 415 A.2d 887 (1980); *Commonwealth v. Glass*, 486 Pa. 334, 405 A.2d 1236 (1979).

██ The second statement complained of was made during the sentencing phase of the proceeding.

DISTRICT ATTORNEY: I would like you to consider, and I have a feeling you've thought about it, when you are asked to be sympathetic and to show mercy and, when you are asked to consider what they're all about, they shed not one tear, not one tear. They have not shown one drop of remorse for what they have done, not one. Even now. Even now.

These remarks, again, were not calculated to inflame the passions of the jury, but merely summarized the evidence presented at trial. *See Commonwealth v. Whitney*, 511 Pa. 232, 512 A.2d 1152 (1986). From their conduct and conversation with each other and among acquaintances, an inference could fairly be drawn that appellants were not remorseful, a factor that legitimately could be weighed by the jury in assessing the presence of any mitigating factors. *Commonwealth v. Travaglia*, 502 Pa. 474, 500, 467 A.2d 288, 301 (1983). Thus, the prosecutor's remarks did not force the jury to make unwarranted deductions, *see Commonwealth v. Anderson*, 490 Pa. 225, 415 A.2d 887 (1980), nor were they such that they resulted in unavoidable prejudice. *Commonwealth v. Zettlemoyer, supra.* Appellants' claim of error with respect to this issue must be rejected.

 Appellants next argue that they were prejudiced by the sobbing of the victim's mother during the jury instruction portion of the guilt phase of the trial. This contention is also without merit. The record reflects that after the jury was excused to deliberate, defense counsel placed on the record their objection to Mrs. Milano's show of emotion and requested a mistrial. This motion was properly denied by the trial judge, who noted that the sobbing was barely audible and that it never distracted the attention of the jury who, he stressed, maintained eye contact with him at all times. Accordingly, no prejudice inured to the defendants as a result of this episode.

 Appellants next allege that they were prejudiced by their restraint in handcuffs and shackles during the penalty phase of the proceeding. Appellants argue that they were deprived of their right to appear in court free of restraint.

The Commonwealth argues that the handcuffing and shackling of the defendants did not deprive them of their right to appear in court free of restraint, because that right is diminished during the penalty phase. The Commonwealth submits that once a verdict of guilt has been returned, the presumption of innocence is removed and a defendant cannot be prejudiced by appearing in front of the jury in restraints.

The Commonwealth is correct in asserting that appellants suffered no prejudice in this case. However, appellants' contentions cannot be rejected summarily. While it is true that the presumption of innocence is removed once guilt has been determined, it cannot be said that the appearance of a defendant in shackles could not influence the jury at the penalty phase. An integral part of the jury's determination whether a defendant should be sentenced to death is the threat of danger the defendant poses to the community. Viewing the defendant in handcuffs and shackles during the penalty phase could have the effect of creating in the minds of the jurors the presumption that the defendant is dangerous and therefore worthy of the death sentence.

Nevertheless, a judge has the responsibility and authority to maintain in the courtroom the appropriate atmosphere for the fair and orderly disposition of the issues presented. *Commonwealth v. Patterson*, 452 Pa. 457, 464, 308 A.2d 90, 94 (1973). Thus, notwithstanding the potential for prejudice resulting from this practice, a judge retains the legitimate right to restrain a defendant, even at the penalty phase, if the circumstances so warrant. *See, e.g., Commonwealth v. Africa*, 466 Pa. 603, 353 A.2d 855 (1976); *Commonwealth v. Martinolich*, 456 Pa. 136, 318 A.2d 680 (1974). The trial judge in the instant matter apparently believed, in his discretion, that restraint of the defendants was necessary for the security of the courtroom. Since trial counsel did not object at that point, we can assume only that the judge's belief was justified.[7] There is no evidence of record that the judge abused his discretion. Accordingly, this contention must be rejected.

■ Appellants also argue that the sentencing verdict in this case was coerced by the trial judge. They argue that the trial court erred in not dismissing the jury when the foreman indicated the jury's inability to reach a sentencing decision. Appellants contend that the jury foreman's comments indicated the jury was hopelessly deadlocked, and that upon learning of the impasse, the trial court should have granted a mistrial on the basis of manifest necessity.

Three hours after the jury retired to deliberate, on Friday, May 20, 1988, the trial judge received a note from the jury indicating that it felt "that at this time or at any time in the future, we can not [sic] come to a [sic] agreement or decision on the sentencing verdict ... because of differences in opinion." Counsel for both defendants moved that a mistrial be declared and the defendants sentenced to life imprisonment. As only three hours had elapsed since the deliberations began and the case involved two defendants, that motion was denied. (N.T. 5/20/88, pp. 805–807.) At

7. Had trial counsel objected the judge would have had an opportunity to place on the record his reasons for restraining the defendants.

7:45 p.m. the court suspended deliberations so that the jurors could eat and sleep for the night. (*Id.*, pp. 808–809.)

On Saturday, May 21, 1988, deliberations began at 9:48 a.m. At 3:30 p.m. the jury was reconvened by the court and the judge engaged in the following exchange with the foreman.

THE COURT: Good afternoon, Mr. Henry.

JURY FOREPERSON: Good afternoon.

THE COURT: By the computation which I have been keeping we have noted that you resumed your deliberations this morning at approximately 9:48. And I note the time now is approximately 3:10.

It is not my purpose at this time nor should you in any way disclose—it's not my purpose to find out, nor should you in any way disclose how the jury stands with respect to the issues you are now considering. It would be most inappropriate for me to inquire as to that or for you to reveal it.

I had asked Mrs. Happ to consult with you about whether you wish to receive some food at this time and she advises me that you did. That seemed to be an appropriate time to inquire of you, sir, whether you believe that further deliberations will result in a verdict on either of these cases for today?

JURY FOREPERSON: I can't foresee today, no.

THE COURT: Can you foresee at any time?

JURY FOREPERSON: No.

THE COURT: Would it be worthwhile for you to submit a food order, receive the food and deliberate for a few hours further?

Would that be of any use, do you believe?

JURY FOREPERSON: We could.

THE COURT: I understand that. But do you believe that would be of use to you?

JURY FOREPERSON: No.

THE COURT: Do you believe that deliberations for a further half-hour or so might be productive?

JURY FOREPERSON: No.

THE COURT: Do you believe that it is possible for this jury to reach a unanimous agreement on either of these sentences?

JURY FOREPERSON: No.

THE COURT: Is that a matter you feel strongly convinced of?

JURY FOREPERSON: Very strongly.

The judge then, in a sidebar discussion with counsel, debated whether the jury was hopelessly deadlocked or would be able to reach a decision. After both sides voiced their respective positions, the judge summoned the jury.

THE COURT: Please be seated.

Mr. Henry, have you—I have a couple more questions for you.

One is: In the course of my earlier discussion with you, of course we're referring to both cases, it is possible that you may be able to reach unanimous verdict with either one of these cases?

JURY FOREPERSON: No.

THE COURT: Do you believe that were you to continue to deliberate there is any hope whatsoever that a verdict could be achieved, a unanimous verdict be achieved on either of these cases?

JURY FOREPERSON: (Pause) There is a doubt. There's a doubt.

THE COURT: There's a doubt?

I'm going to take that answer that there may be some possibility?

JURY FOREPERSON: There may, yes.

THE COURT: Helen.

(Off-the-record conversation with tipstaff)

THE COURT: In light of that answer, you may continue your deliberation for a period of time longer.

Should you in the course of these deliberations conclude that there is no hope whatsoever, you would communicate that to me in writing through Mrs. Happ.

JURY FOREPERSON: Yes.

THE COURT: I've also spoken with her about arranging for some modest, not heavy but some modest food for you.

All right.

———

(The jury retires to the juryroom to deliberate upon its verdict at 3:55 p.m.)

The jury rendered its verdict at 5:35 that evening. Appellants contend that by returning the jury for deliberations after their repeated insistence that the process was futile, the trial judge coerced the jury into returning a verdict of death.

■■■■■■ It is well-established that a verdict brought about by judicial coercion is a legal nullity. *Commonwealth v. Moore,* 398 Pa. 198, 206, 157 A.2d 65, 69 (1959); *Miller v. Miller,* 187 Pa. 572, 41 A. 277 (1898). However, the extent of time during which a jury is kept together for deliberation is a matter within the discretion of the trial judge; only for an abuse of such discretion should his action be reversed. *Commonwealth v. Moore, supra.* As we noted in *Commonwealth v. Monte,* 459 Pa. 495, 329 A.2d 836 (1974):

> There are too many variables in the trial of criminal cases which would prevent the formulation of predetermined periods of time for the jury's deliberation. Each case differs in the complexity of the issues presented, the seriousness of the charges, the number of charges to be considered, the amount of testimony to be digested and reviewed, thus requiring the reasonableness of the time for deliberations to be made on a case-by-case basis. In [*Commonwealth v. Monte* ], where only two indictments had been submitted for determination, where the charges were comparatively minor, and the issues to be decided not complex, six and one-half hours was a reasonable

period in which to accept the jury's conclusion that they were hopelessly deadlocked.

459 Pa. at 504, 329 A.2d at 841.

A clear distinction can be drawn between the circumstances of *Monte* and the instant case. In *Monte* the appellants were charged on two counts relating to the operation of a conspiratorial illegal gambling enterprise. Here, however, the two appellants each were charged with seven criminal counts, including homicide and kidnapping. The jury had deliberated a mere three hours before they first indicated some difficulty, and only eight more hours before their next stalemate. In all, the jury deliberated for approximately thirteen hours on the question of whether to impose the death penalty before reaching its final conclusion. At each instance the judge encouraged the jury to keep working and provided the jurors with food or rest as he thought it necessary; nevertheless, he candidly informed the jury that it was free to return if it found the deliberation process to be hopeless. Also significant is the fact that when the judge interpreted the foreman's comments to imply optimism that the jury could at some point reach a verdict, the foreman did not dissuade him from that interpretation. Under the circumstances of this case, therefore, we find the judge to have acted reasonably, and we can find no abuse of discretion to have occurred. Accordingly, appellants' contention that the verdict was coerced must be rejected.

At the penalty phase of the proceeding the Commonwealth argued that the facts adduced at trial, specifically those related to the pain and suffering experienced by the victim, established the aggravating circumstance of torture, 42 Pa.C.S. § 9711(d)(8). The Commonwealth also argued that the jury's verdict of guilt on the kidnapping charge was sufficient to establish that appellants had committed a killing while in the perpetration of a felony, an aggravating circumstance found at 42 Pa.C.S. § 9711(d)(6). Appellants contest the sufficiency of the evidence to sustain these aggravating circumstances.

■■■ Appellants' first contention in this regard is that there was insufficient evidence to establish the aggravating circumstance of torture, and that, therefore, instruction to the jury on that issue was improper. Appellants argue that the fact that expert testimony concluded that the victim was probably rendered unconscious when his throat was cut negates the possibility that he could have suffered in the ten or fifteen minutes during which he aspirated on his own blood and subsequently expired. Thus, the Commonwealth failed to prove that defendants had a specific intent to inflict pain and/or suffering.

■■■ To establish the aggravating circumstance of torture, the Commonwealth must prove that the defendant intended to inflict a considerable amount of pain and suffering on the victim which is unnecessarily heinous, atrocious, or cruel, manifesting exceptional depravity. *Commonwealth v. Thomas*, 522 Pa. 256, 561 A.2d 699 (1989). This proof is separate from that which supports a finding of specific intent to kill. *Commonwealth v. Pursell*, 508 Pa. 212, 239, 495 A.2d 183, 196 (1985). Implicit in the definition of torture is the concept that the pain and suffering imposed on the victim was unnecessary, or more than needed to effectuate the demise of the victim. *See id.*

Appellants' argument seems premised upon the notion that because Anthony Milano was rendered unconscious soon after the attack began and therefore probably did not suffer any pain, the Commonwealth cannot prove that appellants had the intent to inflict excessive pain. This argument is patently fallacious. Appellants' inability to achieve a particular result does not negate the possibility that they *intended* to bring about the result. The fact that, by some biological miracle, Anthony Milano was spared the severe pain of the injuries which ended his life does not absolve appellants of responsibility for the severity of the injuries they inflicted. Clearly, by slashing Milano's throat more times than even the coroner could count, appellants *intended* to inflict more pain and suffering than was necessary to effectuate Milano's demise. *See, e.g., Commonwealth v.*

*Fahy,* 512 Pa. 298, 516 A.2d 689 (1986). Appellants' argument to the contrary must be rejected.[8]

Appellant Laird next argues that insufficient evidence was presented to establish the crime of kidnapping, upon which the aggravating circumstance of killing in the perpetration of a felony, 42 Pa.C.S. § 9711(d)(6), was found. Laird contends that the Commonwealth failed to demonstrate that defendants unlawfully confined the victim for a substantial period in a place of isolation, as required by 18 Pa.C.S. § 2901. In fact, Laird argues that this element of the kidnapping charge was not even alleged in the criminal information, which stated that appellant "did unlawfully remove one Anthony Milano, a substantial distance from the place he was found, to wit, Edgely Inn."

Again, appellant's contention is meritless. The offense of kidnapping is defined as follows:

§ 2901. Kidnapping

(a) Offense defined.—A person is guilty of kidnapping *if he unlawfully removes another a substantial distance, under the circumstances, from the place where he is found,* or if he unlawfully confines another for a substantial period in a place of isolation, with any of the following intentions:

* * * * * *

(2) to facilitate the commission of any felony or flight thereafter.

(3) to inflict bodily injury on or to terrorize the victims or another.

18 Pa.C.S. § 2901 (emphasis added).

The evidence adduced at trial amply supports the jury's finding of guilt on the kidnapping charge. First, appellant conveniently omits the fact that kidnapping can be established by proof of *either* removal *or* a substantial period of isolated confinement; proof of both is not necessary. Sec-

---

**8.** On the basis of this determination we can also reject appellant Chester's argument that an instruction to the jury on the aggravating circumstance of torture was not supported by sufficient evidence.

ondly, the substantial distance requirement is to be evaluated "under the circumstances." The circumstances of Anthony Milano's departure with appellants were that he believed he was taking the two men to their respective homes. His body was found in a wooded area a substantial distance from the Edgely Inn. Clearly, under these circumstances, the Commonwealth has sustained its burden. *See, e.g., Commonwealth v. Hughes,* 264 Pa.Super. 118, 399 A.2d 694 (1979).

Finally, appellant Frank Chester cites several instances in which he alleges that trial counsel provided ineffective representation.[9] The standard for determining claims of ineffective assistance of trial counsel was set forth in *Commonwealth ex rel. Washington v. Maroney,* 427 Pa. 599, 235 A.2d 349 (1967), and later reaffirmed in *Commonwealth v. Pierce,* 515 Pa. 153, 527 A.2d 973 (1987). In those cases this Court held that counsel is considered ineffective "if the defense actually tendered was so insubstantial in relation to those not offered as to cast doubt upon the hypothesis that trial counsel made a deliberate and informed choice." *Commonwealth ex rel. Washington v. Maroney, supra,* at 604, 235 A.2d at 352, *quoting Brubaker v. Dickson,* 310 F.2d 30, 38 (9th Cir.1962), *cert. denied,* 372 U.S. 978, 83 S.Ct. 1110, 10 L.Ed.2d 143 (1963). The Court established a three-prong test for assessing such claims: 1) is the issue underlying the claim of ineffectiveness of arguable merit; 2) does the course chosen by counsel have a reasonable basis designed to serve appellant's interest; and 3) has the appellant suffered prejudice as a result of counsel's ineffectiveness. *Commonwealth ex rel. Washington v. Maroney, supra. See also, Commonwealth v. Pierce, supra.* We will address appellant's claims *seriatim* in light of these considerations.

9. In a related argument, Chester alleges that the trial court erred in denying his motion to file supplemental post-verdict motions. He claims that the denial of his motion prevented him from raising ineffectiveness issues which are raised for the first time in the instant appeal. Appellant has not been prejudiced by the trial court's actions, however; our rules of waiver are relaxed in death penalty cases. Appellant therefore is not denied the opportunity to raise these issues.

 Appellant's first allegation is that trial counsel was ineffective for failing to cross-examine co-defendant Richard Laird. In support of this allegation Chester cites *Commonwealth v. Grove*, 229 Pa.Super. 293, 324 A.2d 405 (1974), wherein the court found counsel to be ineffective for failing to cross-examine the sole witness who could place defendant at the crime scene. This contention is without merit. In the instant matter, Richard Laird was extensively cross-examined by the Commonwealth, to no avail. Counsel for Chester could reasonably have concluded that further cross-examination of Laird would be useless. Laird never waivered from blaming Chester as the killer, even under rigorous cross-examination by the Commonwealth, and there is no indication in the record that further cross-examination would have revealed any information tending to exculpate Chester. Moreover, throughout his testimony Richard Laird exhibited a feeling of resentment toward Frank Chester for having implicated Laird in the incident.[10] Thus, as the Commonwealth notes, further cross-examination was likely to have been counter-productive. Therefore, appellant Chester's underlying claim is meritless, and he has suffered no prejudice from counsel's choice. His claim of ineffectiveness on this point must be rejected.

 Chester next alleges that trial counsel erred in failing to call as a witness Bucks County District Attorney Alan Rubenstein, who could have testified that Chester agreed to wear a microphone during his telephone conversation. Chester argues that this testimony would have been beneficial in establishing a mitigating circumstance. This contention also lacks merit. Failure to call a potential witness does not constitute ineffective assistance *per se* unless there is some showing that the testimony would have been helpful to the defense. *Commonwealth v. McIntyre*, 492 Pa. 306, 424 A.2d 874 (1981). The district attorney's testimony in this case would not have been helpful because evidence of Chester's cooperation with the police was

10. At one point Richard Laird testified, "I loved you like a brother dude, and you f——ed me, . . . ." (N.T. 5/18/88 at p. 577).

present in the Commonwealth's case-in-chief. (N.T. 5/17/88, at pp. 366–76). There was never any dispute as to the fact that Chester consented to the interception. Moreover, defense counsel stressed this fact in his summation to the jury. Thus, Chester was not prejudiced by trial counsel's failure to call the district attorney.

Chester next argues that trial counsel was ineffective for failing to notify the Commonwealth of his willingness to accept a plea agreement. As the Commonwealth correctly notes, there is no evidence in the record to support the assertion that any plea agreement was offered. Moreover, the Commonwealth asserts that no such offer was made. Thus, trial counsel cannot be deemed ineffective for failing to recommend such an offer.

██ Chester also contends that trial counsel erred in failing to highlight certain facts that could have been weighed as mitigating circumstances. Appellant argues that trial counsel should have placed greater emphasis on the fact that Laird, not Chester, asked Anthony Milano for a ride home from the bar and was seen with a knife and bloody clothes on the day of the murder, that Laird's girlfriend was observed cleaning blood from Laird's boots on the day following the murder, that Laird was blatantly prejudiced toward gays, and that Chester repeatedly cooperated with authorities.

This argument is also meritless. All of the facts to which Chester refers were brought out by Chester himself during the trial and by the various witnesses who corroborated Chester's description of the events following the murder. The information, including the comment by Laird himself which could be construed as anti-homosexual, raising the inference that Chester was less culpable was plainly evident for the jury's consideration, and was apparently rejected by the jury at the guilt phase. Thus, counsel's choice not to pursue this avenue further cannot be deemed unreasonable.

██ Chester also argues that trial counsel was ineffective for failing to proceed with a bench trial, as request-

ed by appellant. Chester contends that he was deprived of his legal right to waive the jury trial and have his case decided by a judge. Again we must reject appellant's claim. Certainly counsel cannot be deemed ineffective for ensuring that his client receives the full panoply of rights guaranteed him. Although hindsight might reveal the comparative worth of alternatives not pursued, an ineffectiveness claim cannot succeed on that basis. *Commonwealth v. Tripplett,* 476 Pa. 83, 381 A.2d 877 (1977). Appellant has failed to demonstrate that a bench trial would have offered a substantially greater potential for success than a trial by jury. *See, e.g., Commonwealth v. Burton,* 491 Pa. 13, 20, 417 A.2d 611, 614 (1980). Moreover, no evidence can be found in the record to support appellant's assertion that he objected to a jury trial. Accordingly, this contention must be rejected.

Chester argues that trial counsel was ineffective for failing to object to the trial court's instructions to the jury on aggravating and mitigating circumstances. Appellant contends that the instruction, which corresponded to the language of the statute,[11] mandates imposition of the death penalty in violation of *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976). In *Woodson,* the United States Supreme Court held that a law imposing a mandatory death penalty violates the constitutional prohibition against cruel and unusual punishment. *Id.* at 287, 96 S.Ct. at 2982–83.

This claim has been raised several times in the past. *See, e.g., Commonwealth v. Blystone,* 519 Pa. 450, 549 A.2d 81 (1988), *cert. granted,* 489 U.S. 1096, 109 S.Ct. 1567, 103 L.Ed.2d 934 (1989); *Commonwealth v. Peterkin,* 511 Pa. 299, 513 A.2d 373 (1986). Our Court has held consistently that the argument is meritless. Moreover, the United States Supreme Court in *Blystone v. Pennsylvania,* 494

---

**11.** 42 Pa.C.S. § 9711(c)(1)(iv) provides:
 [T]he verdict must be a sentence of death if the jury ... unanimously finds one or more aggravating circumstances which outweigh any mitigating circumstances.

U.S. 1078, 110 S.Ct. 1078, 108 L.Ed.2d 255 (1990), also rejected this contention. Accordingly, appellant was not prejudiced by counsel's failure to raise the issue.

Chester's next allegation relates to the jury instructions on accomplice liability. Appellant submits that counsel was ineffective for failing to object to the trial court's failure to instruct the jury to find specific intent as a prerequisite for accomplice liability. Appellant contends that such an instruction is required under *Commonwealth v. Smith,* 480 Pa. 524, 391 A.2d 1009 (1978).

The record belies appellant's contention that no instruction was given to the jury on specific intent. The trial court gave the following instruction to the jury regarding accomplice liability:

> A person is guilty of a particular crime if he is an accomplice of another person who commits that crime. A defendant does not become an accomplice merely by being present at the same scene or knowing about a crime. *He is an accomplice,* however, *if with the intent of promoting or facilitating commission of a crime he solicits, or commands or encourages or requests the other person to commit it or if he aids, agrees to aid or attempts to aid the other person in planning the crime or committing the crime. However, a defendant is not an accomplice* under this concept that I'm explaining to you *if before the other person commits the crime he stops his own efforts to promote or facilitate the commission of the crime.* You may find the defendant guilty of a particular crime on the theory that he was an accomplice so long as you are satisfied beyond a reasonable doubt that the crime was committed and the defendant was an accomplice of the person who committed it. All right. That is the accomplice theory of liability.

(N.T. 5/19/88, pp. 664–5, emphasis added.) This instruction mirrors the language of the statute defining accomplice liability.[12] Moreover, the trial court, when explaining the

12. 18 Pa.C.S. § 306(c) provides a person is an accomplice of another person in the commission of an offense if:

requirements for first degree murder instructed the jury that specific intent to kill must be found. (*Id.*, p. 686.) Clearly the jury was guided as to the mental state required for accomplice liability. An objection to the instructions would not have been justified; therefore, trial counsel was not ineffective for failing to make one.

■ Finally, Appellant Chester argues that trial counsel was ineffective for failing to request a jury charge that would prohibit the death penalty if the jury found him to be a "minor", i.e., less culpable, participant in the crime. Chester contends that the United States Supreme Court in *Tison v. Arizona*, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1982), distinguished the levels of accomplice liability in a first degree murder case in a way which suggests that "minor" participants may not be eligible for the death penalty.

■ In *Tison* the United States Supreme Court relied heavily on its decision in *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), wherein the Court held that the death penalty was excessive punishment when imposed upon a minor actor in a felony who had no intent to kill and no culpable mental state. *Tison*, 481 U.S. at 149, 107 S.Ct. at 1683–84. The *Tison* court expanded the rationale of *Enmund* to reach the holding that major participation in a felony, combined with at least reckless indifference to human life, is sufficient to impose the death penalty. *Id.* at 158, 107 S.Ct. at 1688. However, the holding of *Tison* does not help Chester in the instant case. If, as appellant

(1) with the intent of promoting or facilitating the commission of the offense, he:

(i) solicits such other person to commit it; or

(ii) aids or agrees or attempts to aid such other person in planning or committing it; or

\*　\*　\*　\*　\*　\*

(f) Exceptions.—Unless otherwise provided by this title or by the law defining the offense, a person is not an accomplice in an offense committed by another person if:

\*　\*　\*　\*　\*　\*

(3) he terminates his complicity prior to the commission of the offense. . . .

suggests, a *"Tison* charge" had been given to the jury, he still could have been sentenced to death. The jury had already found him guilty of the felony of kidnapping, and although the defendants' stories conflicted, the evidence plainly demonstrated that both Chester and Laird played major roles in the abduction and killing of Anthony Milano. Having found Chester guilty of first degree murder, not felony murder as in *Tison* and *Enmund,* the jury had already satisfied the minimum culpability requirement of *Tison.*[13] A *"Tison* charge," therefore, would not have been helpful. Accordingly, trial counsel was not ineffective for failing to request such a charge.

As a final consideration, this Court must determine whether the sentence of death imposed by the jury in this case is excessive or disproportionate to the penalty imposed in similar cases. 42 Pa.C.S. § 9711(h)(3)(iii). In making this determination we rely on information accumulated by the Pennsylvania Death Penalty Study formulated pursuant to our mandate in *Commonwealth v. Frey,* 504 Pa. 428, 475 A.2d 700 (1984), which reviews all cases resulting in a conviction for first degree murder since September 1978.

After a review of the information regarding previous convictions involving the aggravating circumstances of torture and killing while in the commission of a felony, we find that the sentence of death imposed in this case is not excessive or disproportionate to similarly decided cases. In fact, the language of the death penalty statute requires imposition of the death penalty in this case. 42 Pa.C.S. § 9711(c)(1)(iv).

For the foregoing reasons, the judgment of sentence is affirmed. The prothonotary of the Supreme Court is directed to transmit a full and complete record of the trial, sentencing hearing, imposition of sentence, and review by this Court to the Governor. 42 Pa.C.S. § 9711(i).

**13.** In fact, it seems clear from *Tison* that states are permitted to enact a sentencing scheme which imposes the death penalty, in proper circumstances, for a crime less serious than first degree murder. *Tison v. Arizona,* 481 U.S. 137, 158, 107 S.Ct. 1676, 1688, 95 L.Ed.2d 127 (1982).

McDERMOTT, J., did not participate in the consideration or decision of the case at No. 102 E.D. Appeal Docket 1989, and did not participate in the decision of the case at No. 103 E.D. Appeal Docket 1989.

FLAHERTY, J., joins the majority opinion and files a concurring opinion.

ZAPPALA, J., concurs in the result.

FLAHERTY, Justice, concurring.

I join in the majority opinion but write separately to emphasize that photographs of the murder victim were properly admitted. As this Court stated in *Commonwealth v. McCutchen*, 499 Pa. 597, 602, 454 A.2d 547, 549 (1982),

A criminal homicide trial is, by its very nature, unpleasant, and the photographic images of the injuries inflicted are merely consonant with the brutality of the subject of inquiry. To permit the disturbing nature of the images of the victim to rule the question of admissibility would result in exclusion of all photographs of the homicide victim, and would defeat one of the essential functions of a criminal trial, inquiry into the intent of the actor. There is no need to so overextend an attempt to sanitize the evidence of the condition of the body as to deprive the Commonwealth of opportunities of proof in support of the onerous burden of proof beyond a reasonable doubt.

Accord *Commonwealth v. Edwards*, 521 Pa. 134, 151–52, 555 A.2d 818, 827 (1989). It was plainly within the discretion of the trial court to allow photographs of the murder victim to be admitted into evidence, even though some of the photographs were gruesome in nature. *Commonwealth v. McCutchen*, 499 Pa. at 602, 454 A.2d at 549 (discretion of trial court governs admission of photographs).