J-S26029-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| SANTOS CASTRO-MOTA | : | |
| | : | |
| Appellant | : | No. 2086 EDA 2018 |

Appeal from the Judgment of Sentence Entered July 5, 2018
In the Court of Common Pleas of Bucks County
Criminal Division at No(s):  CP-09-CR-0002216-2017

BEFORE:   PANELLA, P.J., GANTMAN, P.J.E., and PELLEGRINI*, J.

MEMORANDUM BY GANTMAN, P.J.E.:                    **FILED JULY 1, 2019**

Appellant, Santos Castro-Mota, appeals from the judgment of sentence entered in the Bucks County Court of Common Pleas, following his jury trial convictions for possession with intent to deliver, possession of drug paraphernalia, and conspiracy.[1] We affirm.

In its opinion, the trial court correctly set forth the relevant facts and procedural history of this case.  Therefore, we have no reason to restate them. We add that on July 5, 2018, the trial court sentenced Appellant to an aggregate term of 5 to 10 years' imprisonment, plus 5 years' probation.  On July 13, 2018, Appellant timely filed a notice of appeal.  On July 19, 2018, the court ordered Appellant to file a concise statement of errors complained of on

---

[1] 35 P.S. §§ 780-113(a)(30), (a)(32); 18 Pa.C.S.A. § 903, respectively.

---

*   Retired Senior Judge assigned to the Superior Court.

appeal pursuant to Pa.R.A.P. 1925(b); Appellant timely filed a Rule 1925(b) statement on July 27, 2018.

Appellant raises the following issues for our review:

> WHETHER THE TRIAL COURT ERRED IN GRANTING THE COMMONWEALTH'S MOTION FOR CONSOLIDATION OF THIS MATTER WITH **COMMONWEALTH VS. NELSON SALDANA**—INFORMATION NO. 2215/2017.
>
> WHETHER THE TRIAL COURT ERRED IN ALLOWING THE STATEMENT OF CO-DEFENDANT…TO BE ADMITTED INTO EVIDENCE AT THE TRIAL OF [APPELLANT].
>
> WHETHER THE EVIDENCE WAS INSUFFICIENT TO SUSTAIN THE VERDICT.

(Appellant's Brief at 3).

The standard of review for admission of evidence is as follows: "The admissibility of evidence is at the discretion of the trial court and only a showing of an abuse of that discretion, and resulting prejudice, constitutes reversible error." **Commonwealth v. Ballard**, 622 Pa. 177, 197-98, 80 A.3d 380, 392 (2013), *cert. denied*, ___ U.S. ___, 134 S.Ct. 2842, 189 L.Ed.2d 824 (2014).

> The term "discretion" imports the exercise of judgment, wisdom and skill so as to reach a dispassionate conclusion, within the framework of the law, and is not exercised for the purpose of giving effect to the will of the judge. Discretion must be exercised on the foundation of reason, as opposed to prejudice, personal motivations, caprice or arbitrary actions. Discretion is abused when the course pursued represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill will.

*Commonwealth v. Goldman*, 70 A.3d 874, 878-79 (Pa.Super. 2013), *appeal denied*, 624 Pa. 672, 85 A.3d 482 (2014). "To constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party." *Commonwealth v. Lopez*, 57 A.3d 74, 81 (Pa.Super. 2012), *appeal denied*, 619 Pa. 678, 62 A.3d 379 (2013).

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the Honorable Diane E. Gibbons, we conclude Appellant's issues merit no relief. The trial court opinion comprehensively discusses and properly disposes of the questions presented. (*See* Trial Court Opinion, filed December 31, 2018, at 7-19) (finding: **(1)** Commonwealth charged Appellant and Co-defendant with conspiracy, so joint trial was appropriate; record established Appellant used Co-defendant's absence at trial to his benefit; Appellant's assertion that jury attributed Co-defendant's absence to Appellant is speculative; court instructed jury that evidence of Co-defendant's flight could be considered only against Co-defendant; Appellant did not establish undue prejudice based on joinder of defendants for trial; **(2)** Co-defendant waived *Miranda* rights and gave statement to police about entering into conspiracy with numerous individuals to distribute heroin; Appellant's name was redacted from Co-defendant's statement and substituted with "another person" at trial; court instructed jury multiple times that it could use Co-defendant's statement as evidence only against Co-defendant; Co-defendant's confession did not facially incriminate

Appellant; admission of Co-defendant's statement into evidence did not violate **Bruton v. United States**, 391 U.S. 123, 88 S Ct. 1620, 20 L.Ed.2d 476 (1968); **(3)** Commonwealth presented sufficient evidence to sustain convictions; police stopped Appellant for operating vehicle with expired registration; Officer Howard approached van in three different instances; on third approach, Officer Howard observed black plastic bag on ground, in newly-fallen snow, outside passenger side of van; no other persons were in area; baggie was later determined to contain heroin and other controlled substances; given absence of personal **use** paraphernalia, circumstances of case indicated drugs were possessed with intent to deliver; Commonwealth presented sufficient evidence to establish Appellant and Co-defendant were acting in concert in ongoing criminal conspiracy to deliver controlled substances; Appellant and Co-defendant did not know each other until two days before their arrest and traveled in well-known drug corridor in unregistered vehicle belonging to another individual whom Appellant did not know; most incriminating was fact that Appellant and Co-defendant were travelling with large sum of cash and drugs; Appellant and Co-defendant's actions were consistent with individuals engaged in drug trafficking; based on all circumstances, jury could reasonably conclude Appellant and Co-defendant were in joint possession of drugs seized at stop). The record supports the court's analysis. Accordingly, we affirm on the basis of the trial court opinion.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 7/1/19

**IN THE COURT OF COMMON PLEAS OF BUCKS COUNTY, PENNSYLVANIA**
**CRIMINAL DIVISION**

COMMONWEALTH OF PENNSYLVANIA :  No.  **CP-09-CR-0002216-2017**
**[2086 EDA 2018]**

v.                                                :

SANTOS CASTRO-MOTA                 :

## OPINION

On June 29, 2018, following a joint trial by jury, Santos Castro-Mota (the Defendant) and

Nelson Saldana (Saldana), were convicted of possession with intent to deliver a controlled

substance, specifically a mixture of heroin, fentanyl and/or furanylfentanyl, 35 Pa.C.S. § 780-

113(a)(30), criminal conspiracy, 18 Pa.C.S. § 903, and use and/or possession with intent to use

drug paraphernalia, 35 Pa.C.S. § 780-113(a)(32). The Defendant now appeals.

*Evidence admitted against the Defendant*

On January 7, 2017, Officer Brian Bilecki and Corporal Joseph Gansky of the Bensalem

Township Police Department were monitoring traffic entering Bensalem Township from the

Pennsylvania Turnpike as part of their drug interdiction duties. N.T. 6/27/18 at 36-38. Both

officers have extensive training and experience in investigating the use and distribution of illicit

drugs which includes interdiction training. N.T. 6/27/18 at 24-26; N.T. 6/28/18 at 220-25. As part

of that training, the officers were trained to look for specific indicators of drug activity. N.T.

6/27/18 at 26-36; N.T. 6/28/18 at 223-24.

At approximately 9:14 p.m., the officers observed a light blue Ford van drive through a

cash-only tollbooth. N.T. 6/27/18 at 38-39. After determining that the registration for the vehicle



had expired at the end of September the previous year, the officer's began to follow the van. N.T. 6/27/18 at 39-41; Ex. C-1. As they turned southbound onto Route 1, the officers observed the van driving in reverse on the shoulder of Route 1. N.T. 6/27/18 at 42-43. The officers stopped their vehicle on the shoulder of the road in front of the van and activated their overhead lights. N.T. 6/27/18 at 44. The van then drove out from behind them, stopped alongside the officer's vehicle in the middle of a lane of traffic and asked for directions. N.T. 6/27/18 at 45-46. There were two occupants in the vehicle. N.T. 6/27/18 at 46-48; Ex. C-2. Officer Bilecki directed them to pull over to the shoulder of the road. N.T. 6/27/18 at 46, 50.[1]

When Officer Bilecki approached the van, he noted that there was a single key in the ignition. N.T. 6/27/18 at 53. An "overwhelming" odor of air freshener, commonly used to mask the odor of controlled substances, emanated from the van. N.T. 6/27/18 at 30, 53. Air fresheners and laundry detergent[2] were ultimately retrieved from the floor of the van. N.T. 6/27/18 at 55; Ex. C-3.

The van was occupied by the Defendant and Saldana. N.T. 6/27/18 at 46-48; Ex. C-2. The Defendant, the driver of the vehicle, is a resident of Brooklyn, New York. N.T. 6/27/18 at 47-48, 57, 59; Ex. C-4. Saldana, a resident of Englewood, New Jersey, was seated in the front passenger seat. N.T. 6/27/18 at 47-48, 153; Ex. C-7. The van was registered to Beseliane Diaz, at 2957 North 8th Street in North Philadelphia. N.T. 6/27/18 at 123; Ex. C-1. The Defendant was asked about the owner of the vehicle and how he had come into possession of it. He was unable to provide any information regarding the owner. N.T. 6/27/18 at 113-14. He told police that he had

---

[1] The interaction between the Defendant and the officers was recorded by a mobile video recorder in the officer's patrol car. A redacted version of the audio and visual recording was viewed by the jury. Ex. C-5.
[2] There was no laundry in the van. N.T. 6/27/18 at 57.

2

the van for approximately a week and that he got it from his friend "Julio." N.T. 6/27/18 at 158. He was unable to provide Julio's last name. N.T. 6/27/18 at 114.

While interacting with the Defendant and Saldana, the officers walked to the back of the van to consult with each other. After one of those occasions, Officer Bilecki returned to the driver's door and observed the Defendant talking to someone on a cellular "flip" phone while holding a cellular "smart" phone in his other hand. N.T. 6/27/18 at 130; Exs. C-8, C-9.

While speaking to police, the Defendant gave inconsistent accounts of his previous whereabouts. The Defendant first asserted that that he and Saldana were returning from spending two or three days in Amboy, New Jersey with the Defendant's mother. When he was asked for her address, he told the officers that he did not know her address. N.T. 6/27/18 at 62. The Defendant next told police that he had just returned from Harrisburg where he was looking at a motorcycle he was considering buying from a friend. N.T. 06/27/18 at 155. He stated that he then received a call to pick up Saldana up at the King of Prussia Mall. N.T. 6/27/18 at 62-63. When he was asked what his passenger's name was and how he knew him, the Defendant struggled to answer. N.T. 6/27/18 at 159. The Defendant ultimately stated that he met Saldana in Philadelphia two days prior but could not explain how that "connection occurred." N.T. 6/27/18 at 159. The Defendant told police that Saldana lived off the Boulevard in the area of Wyoming Avenue in Philadelphia which contradicted the information Saldana had provided police. N.T. 6/27/18 at 153.

Officer Bilecki testified that, after the van was stopped, he had several discreet interactions with the Defendant during which he questioned the Defendant. He testified that during his first and second interactions, the Defendant had no difficulty responding to his questions and answering

3

in English. When he questioned him a third time, the Defendant began to indicate for the first time that he did not fully understand what he was being asked. N.T. 6/27/18 at 137-38.

Based on a number of indicators of drug activity, the officers called for a K-9 officer to respond to the scene. After the K-9 officer arrived, but before the K-9 search was conducted, backup Officer Kevin Howard found a black plastic bag on the ground outside the passenger side of the van. N.T. 6/28/18 at 203-06; Ex. C-12. Inside the black bag was a clear plastic bag containing a suspected controlled substance. N.T. 6/27/18 at 161, 163; Ex. C-13.

A K-9 search of the outside of the van was then conducted. The dog, trained to alert when an odor of controlled substance is detected, alerted on both the driver and front passenger's door. N.T. 9/28/18 at 126-28. A K-9 search was conducted of the interior of the van after the vehicle was towed to the Bensalem Township Police Department. During that search, the dog alerted on the floor in between the two front captain's chairs, on the floor boards between and behind the front, passenger captain's chair, on the seat of the front, passenger captain's chair and on the third row of seats at the rear of the van. N.T. 6/28/18 at 130-31, 134-35, 139-40. The K-9 officer testified that where the dog alerts it does not indicate the particular location that a controlled substance was located within the vehicle but rather only indicates that the dog detected the odor of a controlled substance in the van. N.T. 6/28/18 at 138-40. The officer also testified that the odor of a controlled substance can remain for an unspecified period of time. N.T. 6/28/18 at 141-42.

The following items were on the Defendant's person: the two cellular telephones he was using during the vehicle stop, two SIM cards found in his wallet, and $500 in U.S. currency. N.T. 6/27/18 at 143; Exs. C-10, C-11; N.T. 6/28/18 at 43-44. The following items were on Saldana's person: $2,800 in U.S. currency secured with what was described as a rubber band commonly used

4

to secure bundles of heroin and a set of car keys which did not belong to the van. N.T. 6/27/18 at 119, 121, 183; Exs. C-6, C-18.

The Defendant and Saldana were taken into custody at the scene of the vehicle stop. Ex. C-5. They were transported to the Bensalem Township Police Department where they were interviewed by Officer Felix Adorno, a Spanish-speaking officer. N.T. 6/28/18, pp. 86, 147-50. The Defendant made one statement. He told Officer Adorno, "You got nothing on me." N.T. 6/28/18 at 166.

The suspected controlled substance found at the scene of the vehicle stop was subsequently analyzed and was determined to be 78.02 grams of a combination of controlled substances, specifically heroin, fentanyl and furanylfentanyl. N.T. 6/27/18 at 167-68; Ex. C-15. The bags were swabbed for DNA. DNA analysis of those swabs found a "non-searchable mixture" of DNA described as a combination of DNA from multiple sources which prevents the identification of any single source. N.T. 6/28/18 at 100; Ex. C-20.

Detective Timothy Carroll of the Bucks County District Attorney's Office testified as an expert in the use and distribution of illicit drugs. Detective Carroll testified that 78 grams of the controlled substance mixture would be repackaged for sale, resulting in 2,496 individual bags or 178 bundles with a minimum street value of approximately $13,350. N.T. 6/28/18 at 327-28. Based on the amount of the controlled substances, the fact that the controlled substances were packaged in bulk and the lack of any use paraphernalia, Detective Carroll testified that it was his expert opinion that the controlled substances were possessed with the intent to deliver. N.T. 6/28/18 at 328-30.

Neither the previous registered owner of the van nor "Julio" ever made any attempt to retrieve the van. N.T. 6/27/18 at 194.

## Procedural History

On August 2, 2017, the Commonwealth filed a motion to join the defendants in a single trial pursuant to Pa.R.Crim.P. 582(A)(2). A hearing to address that and other pretrial motions began on Thursday, September 14, 2017, and continued through Friday, September 15, 2017. During the hearing, the Defendant opposed the Commonwealth's motion and sought to have the Defendant's case severed based primarily on the assertion that introduction of Saldana's redacted statement to police violated his Sixth Amendment right to confront witnesses. At the conclusion of the proceedings on Friday, this Court indicated that it was inclined to grant the Commonwealth's request to join the defendants and deny the Defendant's request to sever but would defer ruling until the Court had an opportunity to review all of the relevant documents and materials submitted by the parties. N.T. 9/15/17 at 52-66. The hearing was then recessed until Monday morning with the understanding that a jury would be selected at the conclusion of the hearing. On Monday, September 18th, Saldana failed to appear and a bench warrant was issued. N.T. 9/18/17 at 4. The Commonwealth asked for a continuance in order to locate and apprehend Saldana. Counsel for the Defendant sought a continuance due to a personal medical issue. The trial was continued by joint request until October 2, 2017. The trial was thereafter set for November 15, 2017, January 3, 2018 and March 12, 2018. On each occasion the trial was continued at the request of the Commonwealth due to its failure to locate Saldana. The trial was then scheduled for May 7, 2018 but was again continued, on this occasion at the request of the Defendant. A new trial date of June 4, 2018 was set. N.T. 6/4/18 at 3-4, 12.

On May 31, 2018, the Commonwealth filed a "Motion to Proceed to Trial in the Absence of Nelson Saldana."

6

On June 4, 2018, both defendants failed to appear for trial. A bench warrant was issued for the Defendant. The bench warrant issued for Saldana remained outstanding. N.T. 6/4/18 at 6. The trial was set to commence on June 26, 2018. N.T. 6/4/18 at 15. Prior to adjourning, this Court placed its ruling on the record with regard to the Commonwealth's request to join the defendants. N.T. 6/4/18 at 11. The Commonwealth's motion was granted with the caveat that the Defendant's request to sever would be revisited if the Commonwealth sought to try Saldana *in abstentia*. N.T. 6/4/18 at 12.

Prior to the scheduled trial date, the Defendant surrendered himself on the bench warrant. The warrant was ultimately rescinded and bail was reinstated. N.T. 6/26/18 at 3.

On June 26, 2018, a hearing was held on the Commonwealth's request to try Saldana *in abstentia*. N.T. 6/26/18 at 5-18. This Court found that Saldana had voluntarily absented himself from the proceedings and therefore granted the Commonwealth request. N.T. 6/26/18 at 18. In light of that ruling, reargument was held on the Commonwealth's request to join the defendants in a single trial and the Defendant's request to severe. N.T. 6/26/18 at 18-43. This Court determined that Saldana's absence did not prejudice the Defendant and therefore ruled that the previous ruling, joining the defendants for trial, would stand. N.T. 6/26/18 at 43.

### *Joinder of Defendants*

The Defendant challenges this Court's decision to allow the Defendant and Saldana to be tried together. Concise Statement of Matters Complained of on Appeal, ¶ 1. Joinder and severance of defendants are addressed in the Rule 582 and 583 of the Pennsylvania Rules of Criminal Procedure which provide in pertinent part,

> Rule 582. Joinder--Trial of Separate Indictments or Informations
> (A) Standards

***

7

(2) Defendants charged in separate indictments or informations may be tried together if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses.

Rule 583. Severance of Offenses or Defendants

The court may order separate trials of offenses or defendants, or provide other appropriate relief, if it appears that any party may be prejudiced by offenses or defendants being tried together.

Pa.R.Crim.P. 582, 583. The decision whether to grant a motion for severance is a matter within the sound discretion of the trial court and should not be disturbed absent a manifest abuse of discretion. Commonwealth v. Rivera, 773 A.2d 131, 137 (Pa. 2001). Joint trials are advisable where conspiracy is charged. Commonwealth v. Chester, 587 A.2d 1367, 1372 (Pa. 1991). Severance is proper if a defendant can establish that he will be prejudiced by a joint trial. Chester, 587 A.2d at 1372-73. The defendant bears the burden of proving that he was prejudiced by the decision not to sever, and he must show real potential for prejudice rather than mere speculation. Rivera, 773 A.2d at 137.

In the instant case, the Defendant and Saldana were charged with conspiracy. A joint trial was therefore appropriate. Pa.R.Crim.P. 582; Chester, 587 A.2d at 1372. The Defendant asserts that he was prejudiced by Saldana's absence during the proceedings and that he was therefore entitled to severance. Contrary to this assertion, the record establishes that the Defendant used Saldana's absence to his benefit. The Defendant argued to the jury that the drugs were Saldana's and that his flight demonstrated his guilt. N.T. 6/29/18 at 26-27. The Defendant's assertion that the jury could potentially blame him for Saldana's absence is speculative at best. Moreover, the jury was instructed that evidence regarding Saldana's flight was being admitted to establish Saldana's consciousness of guilt and that it could only be considered in the case against Saldana and could not be considered in any fashion as evidence against the Defendant. N.T. 6/29/18 at 99.

8

A jury is presumed to have followed a trial court's instructions.[3] Commonwealth v. Burno, 626 Pa. 30, 94 A.3d 956, 977 (Pa. 2014). The Defendant has therefore failed to meet his burden of establishing prejudice.

In a related argument, the Defendant contends that this Court abused its discretion in admitting Saldana's redacted statement in a joint trial. Stated another way, the Defendant contends that the cases should have been severed because admission of Saldana's redacted confession violated his confrontation clause rights pursuant to Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) and its progeny. Concise Statement of Matters Complained of on Appeal, ¶ 2.

In Bruton, the U.S. Supreme Court held that a defendant is deprived of his rights under the Confrontation Clause when his non-testifying co-defendant's *facially incriminating confession* is introduced at their joint trial, even if the jury is instructed that the confession is only to be considered against the co-defendant. In Richardson v. Marsh, 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d (1987), the U.S. Supreme Court rejected the argument that admission of a co-defendant's confession violated the defendant's confrontation rights because it implicated the defendant in the crime when linked with other evidence. The Court expressly rejected the theory of contextual implication, recognizing the important distinction between co-defendant confessions that expressly incriminate the defendant and those that become incriminating only when linked to other evidence properly introduced at trial. Id. 481 U.S. at 208, 107 S.Ct. at 1707-08. As the Court stated in Gray v. Maryland, 523 U.S. 185, 195, 118 S.Ct. 1151, 1156, 140 L.Ed.2d (1998), "Richardson placed outside the scope of Bruton's rule those statements that incriminate

---

[3] At the Defendant's request, this Court also addressed this issue during jury selection. Those potential jurors who indicated that he or she could not follow the Court's instruction that evidence of Saldana's flight could not be used against the Defendant were dismissed for cause. N.T. 6/26/18 at 53-57, 88-89, 94-98, 105-108, 111-115.

9

inferentially." In cases where a defendant is implicated when linked with other evidence, the Court held, a proper limiting instruction is sufficient to satisfy Bruton. Richardson, 481 U.S. at 211, 107 S.Ct. at 1709. In declining to extend Bruton to "confessions incriminating by connection," the Court stated,

> One might say, of course, that a certain way of assuring compliance [with Bruton] would be to try defendants separately whenever an incriminating statement of one of them is sought to be used. That is not as facile or as just a remedy as might seem. Joint trials play a vital role in the criminal justice system, accounting for almost one-third of federal criminal trials in the past five years. Memorandum from David L. Cook, Administrative Office of the United States Courts, to Supreme Court Library (Feb. 20, 1987) (available in Clerk of Court's case file). Many joint trials—for example, those involving large conspiracies to import and distribute illegal drugs—involve a dozen or more codefendants. Confessions by one or more of the defendants are commonplace—and indeed the probability of confession increases with the number of participants, since each has reduced assurance that he will be protected by his own silence. It would impair both the efficiency and the fairness of the criminal justice system to require, in all these cases of joint crimes where incriminating statements exist, that prosecutors bring separate proceedings, presenting the same evidence again and again, requiring victims and witnesses to repeat the inconvenience (and sometimes trauma) of testifying, and randomly favoring the last-tried defendants who have the advantage of knowing the prosecution's case beforehand. Joint trials generally serve the interests of justice by avoiding inconsistent verdicts and enabling more accurate assessment of relative culpability—advantages which sometimes operate to the defendant's benefit. Even apart from these tactical considerations, joint trials generally serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts. The other way of assuring compliance with an expansive Bruton rule would be to forgo use of codefendant confessions. That price also is too high, since confessions "are more than merely 'desirable'; they are essential to society's compelling interest in finding, convicting, and punishing those who violate the law." Moran v. Burbine, 475 U.S. 412, 426, 106 S.Ct. 1135, 1143, 89 L.Ed.2d 410 (1986) (citation omitted).

Id., 481 U.S. at 209–10, 107 S. Ct. at 1708–09 (footnote omitted).

10

In Commonwealth v. Travers, 768 A.2d 845, 850-51 (Pa. 2001), the Pennsylvania Supreme Court held that the redaction of a non-testifying co-defendant's confession, which replaced any direct reference to the defendant with the words "other man," when accompanied with the appropriate cautionary charge, sufficiently protected a defendant's confrontation clause rights. In implementing Bruton and its progeny, the Court has made it clear that "the challenged co-defendant's statement must be incriminating on its face and that redactions involving the substitution of neutral pronouns (such as ["he," "him" or "the other guy"]) instead of names or other obvious methods of deletion, do not obviously identify the other co-defendants." Commonwealth v. Daniels, 104 A.3d 267, 294 (Pa. 2014).

In the instant case, Saldana waived his Miranda[4] rights and gave a statement to police wherein he admitted that he entered into a conspiracy with a number of individuals to distribute the heroin, fentanyl and/or furanylfentanyl recovered by police. N.T. 6/28/18 at 159-62; Ex. C-22. His verbal and written statements were redacted and presented during the testimony of Officer Felix Adorno. Immediately prior to that testimony this Court instructed the jury that it was only permitted to consider the evidence regarding Saldana's statement as evidence against Saldana and that it was not permitted "under any circumstances" to consider the statement as evidence against the Defendant. N.T. 6/28/18 at 150-51. Officer Adorno then testified as follows:

> Q. And, sir, what information did Mr. Saldana provide to you about Mr. Saldana's involvement in this case?
>
> A. So beginning at the interview, like I said, he was very quiet, but then he began to open up. He advised me that he was in Philadelphia when he received a phone call from another person. This other person that he received the phone call from, he doesn't know the other person's actual real name, only knows him by his street name.
>
> Q. And, sir, did Mr. Saldana advise you what line of work he's in?

---

[4] Miranda v. Arizona, 384 U.S. 436 (1966).

11

A. Yes. He advised me that he does painting, construction in the Philadelphia tri-state area.

Q. Tri-state area including New York and New Jersey?

A. Yes. New York, New Jersey.

Q. Once he advised you that he only knew this individual by a nickname, did he advise you what time another person contacted him?

A. He didn't give me exact time. He couldn't recall at which time he said that we could take a look. He gave consent to search his phone to find out the exact time. I don't recall that exact time, but that's when he gave consent to search.

Q. Did he say how he was contacted?

A. Yes; by cell phone.

Q. And when he was contacted, did Mr. Saldana advise you, I guess, what was said to him?

A. Yes. So when another person had contacted him by cell phone; this was a conversation between him and another person, another person had told him that he would like for him to take a ride with him, another person, to a location in Jersey, New Jersey that's close to New York to pick up a certain amount of U.S. currency, in this case it would be $2,800.

Q. Did he use the word United States currency?

A. No. He just said $2,800.

Q. Did he advise you if he knew why they were procuring that money, or what it's (sic) purpose was?

A. Yes. He advised me that once he told them about the amount, that he told me that the money was supposed to be used for a drug transaction later on in the day, unknown drug substance.

Q. Did Mr. Saldana advise you where he was picked up?

A. The location in Philadelphia.

Q. Did he advise you what he was picked up in?

A. Yes. So he advised me that he was picked up by another person in a white van that in which he had never seen before, never seen this vehicle before, but another person picked him up in that vehicle to drive to New Jersey to pick up the money.

Q. Had Mr. Saldana seen this other person before?

12

A. He had not. He told me that he didn't know this other person very well, just knew him by his name, that he was contacted by cell phone to take the ride with him to pick up the money for the drug transaction.

Q. Once Mr. Saldana was picked up, did he tell you where they went?

A. Yes. He said to a location in New Jersey. He couldn't recall exactly other than it was close to New York. He said that he and another person drove up to that location in New Jersey to meet with associates of another person. He didn't provide any names. He didn't know them. He just -- other than another person that was his associate, not Mr. Saldana. He was not involved with these other individuals, never heard, never saw other than he was there to pick up the money.

Q. Did he say where they headed after they arrived or after Mr. Saldana arrived in New Jersey?

A. Yes. After they picked up the $2,800 from the unknown subjects, Mr. Saldana and another person drove to the Bensalem area to the Neshaminy Mall for the drug transaction that was supposed to take place involving an associate of another person which he wasn't -- Mr. Saldana was not provided any details other than we were to go to the Neshaminy Mall area to meet this person.

Q. Now, when Mr. Saldana is telling you this, how did he appear?
A. He was very -- very nervous throughout. He is stuttering as he is talking. But he kept telling me that he didn't want to give much information, but that -- he didn't want to be labeled as a snitch, but that he felt cooperating with police will benefit on his behalf.

Q. Was he ever aggressive with you?

A. Never.

Q. Was he ever arrogant with you?

A. Never.

Q. Did Mr. Saldana advise you where in the area of the Neshaminy Mall the vehicle was parked?

A. Yes. It would be in the parking lot of the food court, parking lot of the food court area.

Q. What did Mr. Saldana advise you occurred when they arrived in the area of the food court?

A. So upon arrival with Mr. Saldana and another person, another person exited the vehicle that they were in, another person tells

13

Saldana, "You are not to get out of this vehicle for any reason at all." So Saldana said, "Okay." He is going to stay in the vehicle. Approximately 40 minutes goes by. Mr. Saldana doesn't see anyone else that the other person interacts with, other than he was gone for 40 minutes, comes back. And that is pretty much his interaction at that location.

Q. Well, you are aware of the location where Corporal Gansky and Officer Bilecki stopped the van containing Mr. Saldana; correct?

A. Correct.

Q. Is that in the area? Would you expect a van to be coming from the Neshaminy Mall to be stopped on Route 1 in that area?

A. So as Mr. Saldana was telling me about the meeting, another subject with another person in that parking lot of the Neshaminy Mall, I asked him, "Well, that doesn't exactly make sense considering when your vehicle was stopped, which was by the PA Turnpike on the other side of the highway, close proximity of" -- just the way the highways are laid out, it doesn't make sense. Mr. Saldana did tell me that another person did get lost on the highway, which is when they got on the Turnpike, they quickly got back off, which is when they were stopped by other officers.

Q. Did Mr. Saldana advise you of anything that occurred during the traffic stop itself?

A. He advised me after he was talking about police officers at some point during the traffic stop that another person tossed a round object past him. Couldn't see exactly what it was, but it was directly past him out of the window.

Q. And did Mr. Saldana advise you if he was supposed to be compensated monetarily for being involved in this transaction?

A. Yes. So as Mr. Saldana was telling me initially about the $2,800 U.S. currency, he told me he was supposed to get $300 just for carrying the money on his person. That's what he told me.

*** 

Q. Did he tell you why he engaged in this criminal activity?

A. He did say that although he's never been in trouble before, he did participate in this transaction for money for his family in D.R., Dominican Republic.

N.T. 6/28/18 at 153-60.

14

Saldana's written statement was then presented to the jury. Officer Adorno testified as follows:

> So this is the written statement translated into English that Mr. Saldana gave to me. It reads: "I was doing a painting job and I was called to New Jersey to get some merchandise. And the person called me, told me that another person would stop by and pick me up, and I waited for him. We went to Bensalem chopin (sic) mall. They weren't there. But I waited for a while. They never came and later on left for about 40 minutes and then we went back. I couldn't see the person and they also didn't call. Then the police showed us -- stopped us and they checked us. And they found money I had. The person who gave me the money, his name was Carlos. I only knew him by that name. He lives Philly, but I don't know much about him."

N.T. 6/28/18 at 161-62; Ex. C-22. After Officer Adorno testified to the statement made by the Defendant, this Court again instructed the jury that the statement of each defendant could only be considered against the defendant who made the statement. N.T. 6/28/18 at 163-65. In the final instructions, the jury was again instructed that it could consider any statements made to the police by either defendant only as evidence against the defendant who made the statement. N.T. 6/29/18 at 95-97.

The Defendant argues that Saldana's statement violated his right to confront witnesses against him because the statement implicated him when considered in conjunction with the evidence that he was the only person in the van with Saldana. While it is clear that Saldana's statement does implicate the Defendant when linked with other evidence, there is no Bruton violation unless the challenged co-defendant's statement is incriminating on its face. Richardson, 481 U.S. at 211, 107 S.Ct. at 1709; Travers, 768 A.2d at 850-51. See Gray, 523 U.S. at 195, 118 S.Ct. at 1156 ("Richardson placed outside the scope of Bruton's rule those statements that incriminate inferentially."). Saldana's redacted statement did not explicitly reference or facially incriminate the Defendant. All references to the Defendant were replaced with the neutral phrase

15

"another person" in accordance with the holding in Travers. Moreover, the jury was repeatedly instructed that the statements of each defendant were only to be considered against the defendant who made the statement and was instructed that it was required to follow all of the Court's instructions on the law.[5] N.T. 6/26/18 at 135. The Defendant's claim that the admission of Saldana's confession in a joint trial violated his right to confront the witnesses against him therefore lacks merit.

## Sufficiency/Weight of the Evidence

The Defendant asserts that his convictions are against the weight of the evidence. Concise Statement of Matters Complained of on Appeal, ¶ 3. A challenge to the weight of the evidence "concedes that there is sufficient evidence to sustain the verdict but claims that, 'notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.'" Commonwealth v. Lyons, 833 A.2d 245 (Pa.Super. 2003) (quoting Commonwealth v. Widmer, 744 A.2d 745, 751 (Pa. 2000)). In the instant case, although couched in terms of a weight of the evidence claim, the Defendant's arguments challenge the sufficiency of the evidence and therefore will be analyzed as a sufficiency claim.

The standards for evaluating the sufficiency of the evidence are well established. Where the evidence admitted at trial, and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict-winner, are sufficient to enable the factfinder to conclude that the Commonwealth established all of the elements of the offense beyond a reasonable doubt, there is sufficient evidence to sustain a conviction. Commonwealth v. Martin, 101 A.3d 706, 718 (Pa. 2014) cert. denied Martin v. Pennsylvania, 136 S. Ct. 201, 193 L.Ed.2d

---

[5] This issue was also addressed during jury selection. Each of the seated jurors indicated that he or she could follow the Court's instruction that the statements of the defendants could only be used against the defendant who made the statement and not against his co-defendant. N.T. 6/26/18 at 57-58, 89-90.

16

155 (2015). The Commonwealth may sustain its burden of proof by means of wholly circumstantial evidence. Id. Moreover, the evidence need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the factfinder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. Commonwealth v. Gooding, 818 A.2d 546, 549 (Pa.Super. 2003). In determining the credibility of witnesses and the weight of the evidence, the finder of fact is free to believe all, part or none of the evidence. Commonwealth v. Martin, supra.

The Defendant asserts that there was no evidence to tie him to the controlled substances since the drugs were on the ground next to the passenger side of the vehicle, not on him or inside the vehicle he was driving. Regarding the element of possession,

> [w]hen contraband is not found on the defendant's person, the Commonwealth must establish constructive possession....' Constructive possession is the ability to exercise conscious control or dominion over the illegal substance and the intent to exercise that control. [T]wo actors may have joint control and equal access and thus both may constructively possess the contraband.' The intent to exercise conscious dominion can be inferred from the totality of the circumstances.

Commonwealth v. Jones, 874 A.2d 108, 121 (Pa.Super. 2005) (citations and quotation marks omitted).

In the instant case, the evidence is sufficient to establish that the drugs were in the van at the time the van was stopped and that they were subsequently discarded. Officer Howard testified that he approached the passenger side of the van, where the drugs were ultimately found, three times. All three times he utilized his flashlight. On the first two occasions, he observed the footprints of Officer Gansky, who had previously approached the passenger in the newly fallen snow, but observed no other objects on the ground. On his third approach, he observed a black plastic bag lying in the snow immediately next to the passenger side window, a few feet from the

17

van. He testified that the exposed portion of the bag was dry. He also testified that no persons, other than the defendants, were in the area. N.T. 6/28/18 at 193-207.

The evidence is also sufficient to establish that the Defendant and Saldana were acting in concert and that they were doing so to advance their ongoing criminal conspiracy to delivery controlled substances. The evidence established that these two defendants, one a resident of New York, identified as a source city,[6] the other a resident of New Jersey, who were not known to each other beyond having met two days prior in Philadelphia, decided to again meet up in Pennsylvania. They were traveling along a known drug corridor in an unregistered vehicle of another individual, Beseliane Diaz, who was unknown to the Defendant. The vehicle was registered to an address in North Philadelphia, outside the home state of neither defendant, a neighborhood known to have a high level of drug activity. N.T. 6/27/18 at 123; Ex. C-1.

Consistent with the practices of individuals engaged in drug trafficking, steps had clearly been taken which were designed to conceal the defendants' activities and identities which included the use of a third party vehicle obtained from a location that could not be connected to either defendant, the use of a cash tollbooth to avoid a digital record of their travels, and the use of multiple cellphones and SIM cards, including a "throwaway" phone where no identification is necessary to purchase the phone, thereby allowing the conspirators to communicate with each other without that communication being tracked or traced to any individual. Air fresheners and laundry detergent, used as masking agents to conceal the odor of controlled substances, were present in the van and would have been readily apparent to both occupants given their "overwhelming" odor. See N.T. 6/27/18 at 28-36, 131, 135-36.

---

[6] New York City was identified as a "source city," a central location where large quantities of illegal drugs are conveyed and from which they are thereafter distributed. N.T. 6/26/18 at 33, 122.

18

Most incriminating was the fact that the Defendant and Saldana were traveling with $16,650 in cash and drugs. A jury could reasonably infer that neither defendant would involve an innocent stranger in a drug transaction of that magnitude and risk either losing a substantial investment to a dishonest individual or being reported to law enforcement by a law abiding one. That the Defendant was, in fact, an active co-conspirator was further confirmed by the inconsistent statements he gave to police when questioned which demonstrated that there was no innocent explanation for the circumstances which he and Saldana found themselves and his consciousness of guilt.

Based on all of the circumstances set forth above, the jury could find that the defendants were in joint constructive possession of the drugs seized at the scene of the vehicle strop. Moreover, after careful review of the record, this Court can find no basis to conclude that the verdicts were so contrary to the evidence as to shock one's sense of justice and make an award of a new trial imperative.

For the reasons set forth above, this Court finds the Defendant's claims to be without merit.

BY THE COURT:

12-31-18
Date

DIANE E. GIBBONS, J.

Thomas Gannon, Deputy District Attorney
Bucks County District Attorney's Office
100 N. Main Street
Doylestown PA 18901


Keith J. Williams, Esquire
18 East Oakland Avenue
Doylestown PA 18901